184

### THE ROYAL HIGHLANDERS, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 107403. Promulgated December 8, 1942.

L. A. Flansburg, Esq., for the petitioner.
A. R. Shannon, Esq., for the respondent.

OPINION.

MELLOTT, *Judge:* The Commissioner made several adjustments to the net income shown by petitioner's returns for the calendar years 1937 and 1938 and determined deficiencies in income tax in the respective amounts of $10,729.89 and $5,686.08. Petitioner concedes that some of the adjustments are proper and that there is a deficiency in tax for each year.

Most of the basic facts are not in dispute. Those hereinafter set out have been gleaned from admissions made in the pleadings, from admissions or concessions at the hearing, and from documents received in evidence. Three witnesses, called by petitioner, expressed opinions as actuaries. Their testimony will be referred to briefly in connection with the discussion of issue III.

Petitioner was originally incorporated August 10, 1896, as a fraternal society, operating under a lodge system. It was therefore

exempt from the Federal income tax. On May 4, 1937, having complied with the Nebraska statutes, it became a mutual legal reserve life insurance company. Its first Federal income tax return was duly filed with the collector of internal revenue for the district of Nebraska on March 11, 1938. Its return for the calendar year 1938 was duly filed in the same office on March 6, 1939.

Stated generally, the issues are:

(1) Are the contracts, issued and outstanding on and prior to May 4, 1937, and the earnings therefrom, together with the reserves thereon and other funds held at that time, exempt from taxation under section 101 (3) of the Revenue Acts of 1936 and 1938?

(2) In computing net income for the calendar year 1937, how shall (a) "the mean of the reserve funds required by law and held at the beginning and end of the taxable year" as specified in section 203 (a) (2) of the Revenue Act of 1936, and (b) "the mean of the invested assets held at the beginning and end of the taxable year" as specified in subdivision (4) of the same section, be determined?

(3) May the amount held by petitioner as a "Premium Reduction Credit" reserve be included in computing "the reserve funds required by law" for the purpose of determining the amount of the deduction allowed by section 203 (a) (2) of the Revenue Acts of 1936 and 1938? and

(4) Has petitioner established its right to exclude certain amounts which were included in gross income in its returns?

The issues will be discussed in the order stated, following a brief summary of the facts particularly applicable.

## Issue I.

Petitioner contends that all of the contracts issued by it prior to May 4, 1937, and outstanding on that date, together with all funds and reserves then held, as well as all subsequent earnings upon such contracts and funds, are exempt from taxation under section 101 (3) of the Revenue Acts of 1936 and 1938.[1]

This issue was raised by an "Amendment to Petition" filed subsequent to the hearing in accordance with permission then granted. The present record does not show the number, face amount, or value of the contracts issued prior to May 4, 1937. The income tax return for 1937 shows the net present value of all outstanding policies in force on December 31, 1937, to be $2,531,787, the two principal items being $1,732,981 computed on the basis of the American Experience Table at 3½ percent and $795,521, net value of annuities. No cor-

---

[1] SEC. 101. EXEMPTIONS FROM TAX ON CORPORATIONS.

The following organizations shall be exempt from taxation under this title—

\*          \*          \*          \*          \*          \*          \*

(3) Fraternal beneficiary societies, orders, or associations, (A) operating under the lodge system or for the exclusive benefit of the members of a fraternity itself operating under the lodge system ; and (B) providing for the payment of life, sick, accident, or other benefits to the members of such society, order, or association or their dependents.

responding figures are given for May 4, 1937. The exhibits do show, however, the "Invested Assets Book Values," aggregating $4,559,-624.55 on May 4, 1937, and $4,683,217.38 on December 31, 1937. They also show the reserves and other funds on each date. The return for 1937 shows gross income of $140,824.34; but no attempt was made to show what part of it constituted earnings upon new business or what part constituted earnings upon old business. Statement of counsel for petitioner to the effect that practically no new business was written until long after 1938 because of pending litigation can not be accepted as proof of the fact that all of the business had been written prior to May 4, 1937. But even though the proof may be deficient we prefer not to resolve this issue upon that ground. The arguments of the parties will therefore be considered.

Petitioner contends that all of its contracts were written by it as a fraternal society while governed by a lodge system; that regardless of mutualization all of these contracts continued to be strictly fraternal contracts; and that every reason for the exemption of the funds maintained and held, and the income therefrom, as to these fraternal contracts is still present, the same as before it took on powers, on May 4, 1937, to carry on a mutual business. In this connection it cites *Royal Highlanders* v. *Wiseman*, 299 N. W. 459; *United States Mutual Life Insurance Co. of Indianapolis* v. *State*, 108 S. W. (2d) 484 (Ark.); *Yeoman Mutual Life Insurance Co.* v. *Murphy*, 275 N. W. 127 (Iowa); and *Modern Woodmen of America* v. *State*, 103 S. W. (2d) 38 (Ark.). It also places substantial reliance upon the following excerpt from a decision rendered under date of December 7, 1939, by the District Court of Lancaster County, Nebraska, in an appeal taken by it from an order of the Director of the Department of Insurance of Nebraska:

The transformed company is a continuation of the fraternal corporation, with authorized changes in organization and operation. The change from a fraternal to a mutual by amendment of the Articles did not affect the identity of the corporation, and we are not dealing with a new corporation. The title to the assets remains in the same company. The respective beneficial rights of the members in the funds are unchanged. The individual contractual rights are unaffected.

\* \* \* \* \* \* \*

Section 44–415 of the statutes provides against such transformation affecting any right acquired or contract of the company. Both the by-laws and fraternal statutes are a part of the fraternal policies of the company issued prior to May 4, 1937. The fraternal policies remained the same after the change as before, and they now continue as the same kind of contract as they were before the mutualization. The fraternal policies issued before May 4, 1937, by The Royal Highlanders still remain fraternal policies after the change, governed by the by-laws and fraternal statutes.

The fact that the fraternal policies issued by petitioner prior to May 4, 1937, still remained fraternal policies after it became a mutual legal

reserve life insurance company, does not justify the claimed exemption. Section 101, *supra*, grants exemption from taxation to certain "organizations." Prior to May 4, 1937, petitioner was an exempt organization inasmuch as it was a fraternal beneficiary society operating under the lodge system, and issuing policies providing for the payment of life, sick, accident, or other benefits to its members or their dependents. When on May 4, 1937, it changed its form of organization and ceased to operate under the lodge system, it no longer met the requirements of the statute.

It is axiomatic that a taxpayer claiming exemption from tax must bring itself squarely within the statute granting the exemption. *Heiner* v. *Colonial Trust Co.*, 275 U. S. 232; *Producers Creamery Co.* v. *United States*, 55 Fed. (2d) 104; *Register* v. *Commissioner*, 69 Fed. (2d) 607; *Farmers Mutual Cooperative Creamery*, 33 B. T. A. 117. There is no provision in section 101, *supra*, granting a partial exemption from tax and we are not at liberty to read any such provision into it. The tax is imposed upon petitioner as an organization. Cases decided under state law holding the policies to be fraternal contracts after mutualization of the issuing company or exempting from an excise tax the premiums collected on such policies are not determinative. We hold, therefore, that petitioner correctly included in gross income the amounts received after May 4, 1937, "from interest, dividends and rents," as provided in section 202 of the Revenue Act of 1936.

## Issue II.

In computing net income for the calendar year 1937, how shall the mean of the reserve funds required by law and the mean of the invested assets "held at the beginning and end of the taxable year" be computed under section 203 (a) (2) and (4) of the Revenue Act of 1936? [2]

---

[2] SEC. 203. NET INCOME OF LIFE INSURANCE COMPANIES.

(a) GENERAL RULE.—In the case of a life insurance company the term "net income" means the gross income less—

\* \* \* \* \* \* \*

(2) RESERVE FUNDS.—An amount equal to 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year, except that in the case of any such reserve fund which is computed at a lower interest assumption rate, the rate of 3¾ per centum shall be substituted for 4 per centum. Life insurance companies issuing policies covering life, health, and accident insurance combined in one policy issued on the weekly premium payment plan, continuing for life and not subject to cancellation, shall be allowed, in addition to the above, a deduction of 3¾ per centum of the mean of such reserve funds (not required by law) held at the beginning and end of the taxable year, as the Commissioner finds to be necessary for the protection of the holders of such policies only;

\* \* \* \* \* \* \*

(4) INVESTMENT EXPENSES.—Investment expenses paid during the taxable year: Provided, That if any general expenses are in part assigned to or included in the investment expenses, the total deduction under this paragraph shall not exceed one-fourth of 1 per centum of the book value of the mean of the invested assets held at the beginning and end of the taxable year.

The following schedule shows the computation of the deductions claimed by petitioner under these statutory provisions:

|  | May 4, 1937 | Dec. 31, 1937 |
|---|---|---|
| Reserve for outstanding policies and annuities | $1, 657, 603. 76 | $1, 736, 266. 00 |
| Premium reduction credits and reserve for adjustment credits | 722, 521. 52 | 701, 464. 23 |
| Reserves to cover nondeduction of deferred fractional premiums at death | 28, 557. 88 | 29, 856. 00 |
| Total reserves | 2, 408, 683. 16 | 2, 467, 586. 23 |
| Add totals and divide by 2. Mean is $2,438,134.70. Claimed deduction $91,430.05. (3¾% of $2,438,134.70.) Book value of invested assets | 4, 559, 624. 55 | 4, 683, 217. 38 |
| Add and divide by 2. Mean is $4,621,420.96. Claimed deduction $11,553.55. (¼ of 1% of $4,621.420.96) | | |

Respondent determined that the mean should be computed by dividing by two the total reserves and the book value of the invested assets on December 31, 1937. In other words, that the amounts shown on petitioner's books for May 4, 1937, should not be taken into consideration. He summarizes his contentions thus: Petitioner is not entitled to use the reserves and invested assets as at May 4, 1937, in determining the mean "because that date was not the beginning of its taxable year"; "second, the removal of the exemption not being retroactive, petitioner can not use its reserves and invested assets as of January 1, 1937, due to the fact that petitioner was not then subject to taxation under the Federal income tax law. In other words, for the purpose of this statute, the reserves and invested assets at the beginning of the year 1937 was zero." Petitioner is not attempting to use its reserves and invested assets as of January 1, 1937, so respondent's second contention need be given no consideration, except in so far as it impinges upon the first.

Petitioner's return for 1937 was made upon Form 1120 L, which, upon its face, appears to be a return for the calendar year 1937. The answers to the questions on the form, however, indicate and it is found as a fact that the return only included gross income and deductions for the portion of the year 1937 from May 4 to December 31.

But the conclusion which has been reached is not dispositive of the issue. Citing section 41 of the Revenue Act of 1936 [3] and the regulations adopted under it,[4] respondent argues:

---

[3] SEC. 41. GENERAL RULE.

The net income shall be computed upon the basis of the taxpayer's annual accounting period (fiscal year or calendar year, as the case may be) in accordance with the method of accounting regularly employed in keeping the books of such taxpayer; but if no such method of accounting has been so employed, or if the method employed does not clearly reflect the income, the computation shall be made in accordance with such method as in the opinion of the Commissioner does clearly reflect the income. If the taxpayer's annual accounting period is other than a fiscal year as defined in section 48 or if the taxpayer has no annual accounting period or does not keep books, the net income shall be computed on the basis of the calendar year. (For use of inventories, see section 22 (c).)

[4] ART. 41–1. Computation of net income.—Net income must be computed with respect to a fixed period. Usually that period is 12 months and is known as the taxable year.

Net income must be computed with respect to a fixed period, which is usually twelve months and is known as the "taxable year." "Taxable year", as defined in Section 48 of the Revenue Act of 1936 is concerned with the taxpayer's period of accounting net income—i. e. calendar year or fiscal year basis—and not with the period for which a return is made, except in the specified instances set out in Section 47 of the same act. The facts of the instant proceeding do not qualify petitioner's return for 1937 as a return for a period of less than twelve months under Section 47. Since petitioner keeps its books on the calendar year basis its taxable year became the calendar year when it lost its exempt status. [The sections referred to are set out in the margin.] [5]

The last sentence of section 48 (a), *supra*, first appeared in section 200 (a) of the Revenue Act of 1924. Section 200 of the Revenue Acts of 1918 and 1921 made no reference to returns for a fractional part of a year and defined the taxable year as the calendar year or the fiscal year, upon the basis of which net income was computed. Prior to the enactment of the 1924 Act, it had been held that a fractional part of a year for which a tax return was made was not a taxable year. *Tacoma Grocery Co.*, 1 B. T. A. 1026; *Arthur Walker & Co.*, 4 B. T. A. 151; *Dorsey Drug Co.*, 7 B. T. A. 229. In reporting the bill which became the Revenue Act of 1924, the House Ways and Means Committee (Report 179, 68th Cong., 1st sess., p. 10) and

Items of income and of expenditures which as gross income and deductions are elements in the computation of net income need not be in the form of cash. It is sufficient that such items, if otherwise properly included in the computation, can be valued in terms of money. The time as of which any item of gross income or any deduction is to be accounted for must be determined in the light of the fundamental rule that the computation shall be made in such a manner as clearly reflects the taxpayer's income. If the method of accounting regularly employed by him in keeping his books clearly reflects his income, it is to be followed with respect to the time as of which items of gross income and deductions are to be accounted for. (See articles 42–1 to 42–3.) If the taxpayer does not regularly employ a method of accounting which clearly reflects his income, the computation shall be made in such manner as in the opinion of the Commissioner clearly reflects it.

[5] SEC. 47. RETURNS FOR A PERIOD OF LESS THAN TWELVE MONTHS.

(a) RETURNS FOR SHORT PERIOD RESULTING FROM CHANGE OF ACCOUNTING PERIOD.— If a taxpayer, with the approval of the Commissioner, changes the basis of computing net income from fiscal year to calendar year a separate return shall be made for the period between the close of the last fiscal year for which return was made and the following December 31. If the change is from calendar year to fiscal year, a separate return shall be made for the period between the close of the last calendar year for which return was made and the date designated as the close of the fiscal year. If the change is from one fiscal year to another fiscal year a separate return shall be made for the period between the close of the former fiscal year and the date designated as the close of the new fiscal year.

(b) INCOME COMPUTED ON BASIS OF SHORT PERIOD.—Where a separate return is made under subsection (a) on account of a change in the accounting period, and in all other cases where a separate return is required or permitted, by regulations prescribed by the Commissioner with the approval of the Secretary, to be made for a fractional part of a year, then the income shall be computed on the basis of the period for which separate return is made.

SEC. 48. DEFINITIONS.

(a) TAXABLE YEAR.—"Taxable year" means the calendar year, or the fiscal year ending during such calendar year, upon the basis of which the net income is computed under this Part. "Taxable year" includes, in the case of a return made for a fractional part of a year under the provisions of this title or under regulations prescribed by the Commissioner with the approval of the Secretary, the period for which such return is made.

the Senate Finance Committee (Report 398, 68th Cong., 1st sess., p. 10) explained the amendment to section 200 as follows:

Section 200: (1) In subdivision (a) of this section the term "taxable year" is defined to include a period of less than a year when a return is made for such period. Under the existing law the use of the term "taxable year" in the "net loss" section and other sections has been construed not to cover the case of a return made by a taxpayer for a fractional part of a year, with the result that the benefits of such sections are denied to taxpayers who are required by law to make a return for a fractional part of a year.

Respondent urges that petitioner's 1937 return is a return for the full calendar year and not for a fractional part of a year, and cites and relies upon *Bankers Trust Co.* v. *Bowers*, 295 Fed. 89; *General Box Corporation*, 22 B. T. A. 725; and *Davis Yarn Co.*, 8 B. T. A. 299. *Bankers Trust Co.*, *supra*, and *Davis Yarn Co.*, *supra*, decided under the provisions of the 1921 Act, hold that returns for less than twelve months occasioned by the death of a taxpayer prior to the end of the calendar year or by the organization of a corporation after the beginning of a calendar year are returns for the full calendar year. *General Box Corporation*, *supra*, holds that where a corporation is required to make two returns governing portions of one annual accounting period, because of statutory provisions requiring it to join with its affiliated companies in a consolidated return covering the period of affiliation, the two taxable periods are not taxable years within the meaning of section 204 (b) of the Revenue Act of 1921. Cf. *Helvering* v. *Morgans, Inc.*, 293 U. S. 121.

The cited cases are clearly distinguishable on their facts. Petitioner was in existence during the entire year 1937, and not for only a fractional part thereof; its return was not a return of all of its income received during the calendar year; and it was not required by statute to make two returns, one for the period January 1 to May 4, 1937, and another for the period May 4 to December 31, 1937.

During the period January 1, 1937, to May 4, 1937, petitioner was an exempt corporation and was not required to make any return of its income for that period. When it became a mutual legal reserve life insurance company on May 4, it lost its exempt status, and, inasmuch as its books were kept on a calendar year basis, it was required to and did file a return for the period May 4 to December 31, 1937. Section 202 (a) of the Revenue Act of 1936 provides that in the case of a life insurance company the term "gross income" means the gross amount of income received during the taxable year from interest, dividends, and rents. In its 1937 return, petitioner included in its gross income only interest, dividends and rents received by it during the period May 4 to December 31, 1937, although it had received similar income from January 1 to May 4, 1937. Ob-

viously, if its taxable year were the calendar year, it should have also reported its income for the period January 1 to May 4, 1937.

While admitting that petitioner in its return reported only its income and expenses for the period May 4 to December 31, 1937, respondent nevertheless insists that petitioner's taxable year is the calendar year 1937 for the reason that its accounting period has been and remains on a calendar year basis. On brief he urges that the term "taxable year," as defined in section 48, *supra*, and as referred to in article 41–1 of Regulations 94, is concerned with the taxpayer's period of accounting for net income and not with the period for which a return is made, except in the specified instances set forth in section 47, *supra*. Article 41–1 merely provides that net income must be computed with respect to a fixed period, and *usually* that period is twelve months and is known as the taxable year. The regulation does not provide that net income must always be computed with respect to a fixed period of twelve months, and inferentially recognizes that unusual instances may arise when it must be computed with respect to a period of less than twelve months.

Respondent's reference to section 47, *supra*, indicates he is of the opinion that unless a return for a fractional part of a year is one that is provided for in that section, then it automatically becomes a return for the full calendar year if a taxpayer keeps its books on a calendar year basis. We do not, however, so interpret this section. Its purpose was to outline a plan for computing tax liability of a taxpayer which, because of a change in its accounting period, affiliation, etc., was required or permitted by the Commissioner to make "a separate return" for a fractional part of a year. *Bankers Trust Co.* v. *Bowers, supra*. It was never intended to prevent a corporation filing its first return as a taxable entity from filing a return for the period of the year in which it received taxable income, or to require that a return so filed be held to be a return for the full calendar year when in fact it was not.

Petitioner filed a return for the fractional part of the year 1937 during which it was a taxable entity. Section 48 (a) provides that the term "taxable year" includes in the case of a return made for a fractional part of a year the period for which a return is made. Where no return was required for a portion of the year because petitioner was an exempt corporation, its taxable year, in our judgment, constituted the period covered by the return. The beginning of that year was May 4, 1937, and not January 1, 1937, as determined by the respondent. It follows that petitioner was entitled to use its reserves and invested assets as at May 4, 1937, in computing the mean of its reserves and invested assets for the purpose of deductions allowed by section 203 (a) (2) and (a) (4) of the Revenue

Act of 1936. In computing the mean of the reserves, however, the amounts of $722,521.52 and $701,464.23 shown in the schedule above as "Premium Reduction Credits and Reserve for Adjustment Credits" on May 4 and December 31 must be eliminated. (See issue III.)

## Issue III.

This issue involves a so-called "Premium Reduction Credit Reserve" and requires determination whether it is a "reserve required by law" within the purview of section 203, *supra.*

In petitioner's return for 1938 its reserves at the beginning and end of the taxable year were shown as follows:

|  | Beginning of year | End of year |
|---|---|---|
| Reserve for outstanding policies and annuities | $2,533,087.00 | $2,688,776.81 |
| To cover nondeduction of deferred fractional premiums at death | 29,856.00 | 32,479.00 |
| Premium reduction credits | 110,279.00 | 758,113.88 |
| Total | 2,673,222.00 | 3,479,369.69 |

The respondent in his notice of deficiency shows them as follows:

|  | Beginning of year | End of year |
|---|---|---|
| Reserve for outstanding policies and annuities | $1,732,981.00 | $2,687,400.96 |
| Fidelity policies | 3,353.00 | |
| Other reserves | 1,232.00 | |
| Reserve to cover nondeduction of deferred fractional premiums | 29,856.00 | 32,479.00 |
| Total | 1,767,422.00 | 2,719,879.96 |

Bringing forward the schedules shown in issue II and giving effect to the admissions and concessions of the respective parties, the present issue may be depicted by the following schedule:

|  | May 4, 1937 | Dec. 31, 1937; Jan. 1, 1938 | Dec. 31, 1938 |
|---|---|---|---|
| Reserve for outstanding policies and annuities | $1,657,603.76 | $1,736,266.00 | $2,687,276.81 |
| Reserve to cover nondeduction of deferred fractional premiums at death | 28,551.52 | 29,856.00 | 32,479.00 |
| Claimed by petitioner and conceded by respondent so far as amount is concerned (see, however, issue II) | 1,686,155.28 | 1,766,122.00 | 2,719,755.81 |
| Claimed by petitioner as a reserve for "Premuim Reduction Credits"—not conceded by respondent | 722,521.52 | 701,464.23 | 642,345.81 |

The genesis of the "Premium Reduction Credit Reserve" is substantially as follows: Prior to 1930 petitioner issued only fraternal policies on the assessment plan. No legal reserves were provided. Premiums on these fraternal policies were divided into two parts, first the portion which was to be used for the purpose of paying claims, making up the "Fidelity Fund," and, second, the portion which was to be used for expenses, making up the "Expense Fund." The rates charged for the fraternal policies were not adequate ac-

cording to the American Experience Table of Mortality at 3½ percent interest; but over a period of years they had been more than sufficient to pay the claims which had accrued and assets had been accumulated in the "Fidelity Fund."

In September 1929 petitioner amended its bylaws to permit the issuance of new forms of policies on the legal reserve basis, providing for cash surrender and loan values. Section 145 of the bylaws provided:

All life benefit business written on Legal Reserve Basis shall be valued upon the American Experience Table of Mortality with an interest assumption of 3½ per cent, or at the option of the Executive Committee, such other standards as may be approved by the laws of the State of Nebraska. They shall be termed Ideal Reserve Policies.

Section 165 provided:

Any member admitted prior to January 1, 1930, may exchange his present benefit certificate for any other plan, rates for which are based upon the American Experience Table of Mortality and 3½%, subject to such conditions and regulations as the Executive Castle or Executive Committee may prescribe from time to time. Such members shall be rated at their attained age, nearest birthday to the date of the new policy. Such new rate shall begin the first day of the month following application for such exchange, and such new policy shall be dated accordingly; and provided that no member so exchanging shall be entitled to disability benefits on account of any such disability as shall exist at the time of exchange, or occur within one year from the date of such exchange.

Any member exchanging to a plan in force after January 1, 1930, shall be allowed such reductions in his monthly premium rates as an equitable apportionment of any accumulation resulting from his previous contributions will purchase under the regulations authorized by the Executive Committee. * * *

Section 44–347 of the Compiled Statutes of Nebraska (1931 to 1941 inclusive) is shown in the margin.[6] The portion shown in italics was added in 1931.

---

[6] Section 44—347. Fraternal, Beneficiary Associations and Societies, Rights of Members Extended.

No company, association or society, other than a legal reserve life insurance company, life association or fraternal beneficiary association or society maintaining reserves on the basis of the American Experience Table of Mortality with an interest assumption of not more than four per cent, or some higher standard shall hereafter give or promise any cash surrender values in its policies whatever, except for the unearned premium. Each accident corporation which has heretofore issued policies providing for a cash surrender value at any given period shall value such policies as pure endowments based upon an experience table and the rate of interest authorized by this article. This reserve shall be in addition to the unearned premium reserve of such a company. Every policy heretofore issued by any other insurance corporation shall be valued either according to the terms of the policy itself or the provisions of this article. Provided, the right of a fraternal beneficiary association or society to pay old age benefits or disability benefits to its members as provided in its rules or by-laws, shall not be affected by the provisions of this act. *And provided further, any fraternal beneficiary association or society may enter into contracts providing for paid up insurance and granting such benefits, as well as cash surrender and loan values, and in favor of such beneficiaries, as its laws may authorize when it shall, for the payment of such benefits and obligations, provide and maintain reserves on the basis of the American Experience Table of Mortality, with an interest assumption of not more than four per cent, or some higher standard.* And provided, further, that

During 1930, petitioner commenced to write legal reserve policies, and to permit its members to exchange assessment policies for the new reserve policies at higher rates. Whenever such an exchange was made petitioner transferred to its "Premium Reduction Credit Reserve" the amount of the actuarial credit which the member had accumulated in the Fidelity Fund for the payment of the death risk on his assessment certificate. After the legal reserve premium was computed for an ideal reserve policy received in exchange for an assessment policy, the amount of cash to be paid by the policyholder for each premium was reduced by the calculated amount of his interest in the "Premium Reduction Credit Reserve."

Respondent determined that the amounts included in the "Premium Reduction Credit Reserve" did not represent "reserve funds required by law" within the intendment of section 203 (a) (2), *supra*, and therefore should not be considered in the computation of the mean of such reserve funds. He argues that the so-called "Premium Reduction Credit Reserve" is a surplus fund and not a reserve fund, and that, even if it should be considered a reserve fund, it is not such a reserve as is required by law, at least until payments therefrom actually flow into petitioner's legal reserves as credits are granted to reduce the legal reserve premiums.

Petitioner contends that it was commanded by the provisions of section 44–347 of the Compiled Statutes of Nebraska, *supra*, to transfer to the reserve for the legal reserve policy the amount which a member had accumulated in the fidelity fund; that amounts so transferred constitute the premium reduction credit reserve; that the credit received by each member exchanging an assessment policy for an ideal reserve policy fully paid for a portion of the reserve policy and was not unlike paying a single premium for so much insurance; and that the amount of the credit, plus the amount to be raised by the additional premium payment, furnished the fund, or legal reserve,

---

fraternal beneficiary associations or societies or life associations, issuing such forms of contract herein provided for, or granting cash surrender values in any of its certificates or policies, shall show by an annual valuation made by a competent actuary, approved by the Department of Trade and Commerce of this state, that it is accumulating and maintaining as to such certificates or policies the reserves required by the above named mortality table at the interest rate above named or higher standard, as the case may be. Any such fraternal beneficiary association or society or life association shall carry as a liability the reserves so determined and the assets representing such reserves shall be held in trust for such members separate and distinct from assets belonging to members holding certificates or policies on which such reserves are not maintained, and the assets so held in trust shall not be used to pay any claims or benefits upon any certificate or policy to members other than the members for whom such assets are so held in trust. *And provided further, that any member of a beneficiary association or society holding a certificate therein and who desires to surrender such certificate in exchange for any other form of certificate issued by such association or society, shall, by taking such new certificate, not lose his accumulated actuarial credit in the funds of the association, but he shall be entitled to the transfer of such funds to the amount of such credit to the funds held for the benefit of such new certificate and shall be entitled to a deduction justified by such credit upon the assessments and payments he shall be required to make for such new certificate.*

which represented the amount which would pay the policy at the death of the insured.

In *Maryland Casualty Co.* v. *United States*, 251 U. S. 342, the Supreme Court defined the term "reserve" as follows:

The term "reserve" or "reserves" has a special meaning in the law of insurance. While its scope varies under different laws, in general it means a sum of money, variously computed or estimated, which, with accretions from interest, is set aside, "reserved", as a fund with which to mature or liquidate, either by payment or reinsurance with other companies, future unaccrued and contingent claims, and claims accrued, but contingent and indefinite as to amount or time of payment.

\*  \*  \*  \*  \*  \*  \*

Reserves, as we have seen, are funds set apart as a liability in the accounts of a company to provide for the payment or reinsurance of specific, contingent liabilities. They are held not only as security for the payment of claims, but also as funds from which payments are made.

In *Helvering* v. *Inter-Mountain Life Insurance Co.*, 294 U. S. 686, it was said:

In life insurance the reserve means the amount, accumulated by the company out of premium payments, which is attributable to and represents the value of the life insurance elements of the policy contracts.

We are unable to agree with petitioner's contention that section 44–347, *supra*, of the Compiled Statutes of Nebraska required it to transfer to the reserve for the legal reserve policy the amount which a member had accumulated in the fidelity fund. It simply required that the accumulated actuarial credit be transferred to *funds held for the benefit of the new certificate* and that the member be given a deduction justified by such credit upon the assessments and payments he was required to make on the new certificate. Petitioner's bylaws were to the same effect. They provided that a member acquiring an ideal reserve policy in exchange for an assessment policy should "be allowed such reduction in his monthly premium rates as an equitable apportionment of any accumulation resulting from his previous contributions will purchase under regulations authorized by the Executive Committee." While the "Premium Reduction Credit Reserve" fund was "held for the benefit of the new certificate" by reason of the fact that it was the source which supplied the amount of the premium reductions, it was not a fund held to meet future unaccrued and contingent claims under the policies.

Petitioner's argument that the credit received by each member exchanging an assessment policy for an ideal reserve policy fully paid for a portion of the reserve policy and was not unlike paying a single premium for so much insurance is unsound. Taking the illustration used by it of a member obtaining a policy, the level payment annual premium upon which is $38, petitioner would have it treated as if the

$32 to be paid by the member was purchasing 32/38 of the policy while the company was using the credits "to buy fractional paid-up insurance of the amount which those credits were sufficient to buy." It is sufficient for present purposes to point out that this was not done. The company issued but one policy. The essence of the agreement between petitioner and its policyholder was that 32/38 of the annual premium should be paid by him and that the remainder should be paid out of the "Premium Reduction Credit Reserve."

Three actuaries, called as witnesses by petitioner, stated that the premium reduction credit reserve was necessary for the payment of the policies; that no part of it could be diverted to any other purpose without impairing the fund set aside for such payment; and that such fund constituted a part of the reserves required to be held by petitioner in order to meet its insurance obligations. The premium reduction credit reserve fund was necessary for the payment of the policies in the sense that its purpose was to supply the difference between the mathematical premium required to maintain the reserves computed on an actuarial basis and the actual premium charged. If any part of the fund should be diverted to any other purpose, an impairment of the amount required for the payment of the policies would indirectly result therefrom. It is important to bear in mind, however, that the fund was set aside for the purpose of granting premium reductions, and not for the purpose of meeting insurance obligations on the policies.

The purpose of the deduction provided for in section 203 (a) (2), *supra*, was to permit insurance companies to deduct that portion of their interest income which they were required to add to the reserves required by law. *Commissioner* v. *Monarch Life Insurance Co.*, 114 Fed. (2d) 314. These reserves include only those which are set aside as a fund to mature and liquidate future unaccrued and contingent claims on policies. As heretofore pointed out, petitioner's "Premium Reduction Credit Fund" was simply set aside to take care of a portion of the premiums. If the amount set aside for this purpose rather than the portion actually applied to the payment of premiums be included as a part of the reserves which petitioner is required by law to maintain on its policies, the reserves would exceed those which the law required petitioner to maintain for the purpose of meeting its policy obligations, and any deduction based thereon would be greater than Congress intended to allow.

The fund in issue does not differ in any material respect from that involved in *North American Reassurance Co.*, 29 B. T. A. 683. Section 85 of the insurance statute of the State of New York provided that when the actual premium charged for insurance by any life insurance corporation doing business in·New York State was less than the net premium for such insurance computed according to the table

of mortality and rate of interest prescribed, the corporation should be charged as a separate liability with the value of an annuity, the amount of which should equal the difference between such premiums and the term of which in years should equal the number of future annual payments due on such insurance at the date of the valuation. In compliance with this statute the company set up on its books so-called "deficiency reserves" and contended that its "separate liability" under section 85 was a part of the "reserve funds required by law." This contention was found to be unsound, it being pointed out that section 85 simply provided an assured source of the difference between the mathematical premium required to maintain the reserves computed on an actuarial basis and the actual premium charged.

In our judgment the respondent did not err in holding that petitioner was not entitled to include in its reserves required by law the amounts in its "Premium Reduction Credit" fund and this issue is decided against petitioner.

## Issue IV.

In the petition it is alleged that petitioner erroneously reported as rentals in its income tax return for the year 1938 receipts from the sale of livestock in the amount of $13,214.43. It is also alleged that petitioner erroneously reported as real estate expense the sum of $6,797.39 which should have been reported as expense for the care of livestock. Petitioner therefore contends that there had been an erroneous report of income in the net amount of $6,417.04. In the amendment to the petition it is alleged that petitioner erroneously included in its income tax return for 1937 the amount of $1,632.45 as rents when in fact such moneys were the net proceeds from the sales of cattle. These allegations are denied by the respondent in his answer.

The sole evidence upon these issues is the testimony of petitioner's actuary. Explaining a schedule which he had prepared he said: "* * * we should have deducted the net proceeds of the sale of cattle [in 1937], which amounted to $1632.45." Later he stated: "Livestock was sold [in 1938] in the amount of $13,214.43 which was included in rent income as reported on the first page of the return. And the rental income should be decreased by that amount. Then there was expense in connection with the sale of cattle in the amount of $6797.39." The following colloquy then ensued:

Attorney for Petitioner. Q. Which was included in real estate expense and which should be deducted from real estate expense?

Attorney for Respondent. Just a moment. Have you raised in your petition the question of real estate expense?

Attorney for Petitioner. Well, sales of livestock—That is very incidental to these sales of livestock.

It is impossible to make findings of fact based upon this testimony which would form the basis for a conclusion that the amounts in issue had been erroneously included in petitioner's gross income for the two years as alleged. The question need not be labored. Suffice it to point out that petitioner has not shown how, when, or under what circumstances the cattle were acquired or sold, how much they cost, what the sales prices were, or what expenses were incurred in making the sales. Without this information the "net proceeds" derived can not be computed. This issue must be decided against petitioner for failure to sustain its burden of proof.

*Decision will be entered under Rule 50.*