THE ECONOMY SAVINGS AND LOAN COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 350.   Promulgated August 1, 1945.

544

*Wallace C. Magathan, Esq.*, for the petitioner.
*Lawrence R. Bloomenthal, Esq.*, for the respondent.

## OPINION.

HILL, *Judge*: The underlying question is, When did petitioner's taxable year begin? If, as petitioner contends, its taxable year began October 1, 1939, petitioner is not subject to excess profits taxes or the income tax rates imposed by the Second Revenue Act of 1940, which applies only to taxable years beginning after December 31, 1939. Petitioner claims that the change in its business activities whereby it lost its exempt status under the Revenue Act of 1938 did not change its accounting period. It contends that its taxable year is the full 12 months commencing October 1, 1939, and that, since the law requires the use of an annual accounting period, respondent's. determination based on an 8-month accounting period violates this requirement, because it creates a hybrid entity, part taxable and part exempt. Petitioner further contends that in any event its taxable income for the 8-month period commencing February 1, 1940, should be determined by eliminating four-twelfths of its total income for the 12-month period October 1, 1939, to September 30, 1940, irrespective of when that income was received or when the expenses in connection therewith were incurred. Respondent claims that under our decision in *Royal Highlanders*, 1 T. C. 184; reversed on other grounds, 138 Fed. (2d)

240, petitioner was not a taxable entity until February 1, 1940. Respondent takes the position that petitioner's income and disbursements prior to that date are not his concern, because petitioner was exempt. Also that, since petitioner is on a cash basis and lost its exemption as of that date, it is only the net income after that day which is subject to tax and is the basis of his determination. Respondent contends that petitioner's return for the period February 1 to September 30, 1940, was a return for less than 12 months, a return for a taxable year commencing after December 31, 1939, and therefore petitioner is subject to the income tax rates imposed by the Second Revenue Act of 1940 and subject to the excess profits taxes imposed by that act.

Petitioner challenges respondent's action in computing the income tax on its actual net income for the 8-month period. Petitioner is on the cash basis. Admittedly the income sought to be taxed by the respondent was received in the 8-month period. Petitioner has not shown that it is necessary to prorate the income for the 12-month period, and for that reason the cases relied on are distinguishable. Cf. *Gage Coal Co.*, 2 T. C. 488.

As to the balance of petitioner's argument, we think respondent must be sustained on authority of our decision in *Royal Highlanders, supra*. In that case the Royal Highlanders, an insurance company, had been organized as a fraternal society operating under a lodge system and was therefore exempt from Federal income tax. Its accounting period was the calendar year. On May 4, 1937, it amended its charter so as to become a mutual legal reserve life insurance company, and it thereby became subject to tax. In reporting its income for 1937 it included only the income and deductions for the period May 4 to December 31. The Revenue Act of 1936 granted life insurance companies a deduction based upon a computation of reserve funds held at the beginning and end of each taxable year. The insurance company contended that the start of its tax year was May 4, 1937, the date it lost its exempt status, and that it was entitled to compute its reserves based upon its invested assets and reserves as of that date. The Commissioner contended, as petitioner does here, that the transition from the exempt to nonexempt status had no effect on the accounting period and that, since the reserves at the beginning of taxpayer's calendar year were zero, the only figure available for such computation was the reserves at the end of the calendar year. We ruled against the Commissioner and sustained the insurance company's right to compute its reserves as of the day it lost its exempt status. We held that the return for the period May 4, 1937, to December 31, 1937, was for a taxable year and the only period in which petitioner was subject to tax. We said:

During the period January 1, 1937, to May 4, 1937, petitioner was an exempt corporation and was not required to make any return of its income for that

period. When it became a mutual legal reserve life insurance company on **May 4**, it lost its exempt status and, inasmuch as its books were kept on a calendar year basis, it was required to and did file a return for the period May 4 to December 31, 1937. * * *

\* \* \* Where no return was required for a portion of the year because petitioner was an exempt corporation, its taxable year, in our judgment, constituted the period covered by the return. The beginning of that year was May 4, 1937, and not January 1, 1937, as determined by the respondent. * * *

So here, when petitioner changed its methods of operation so that substantially all of its business was done with strangers instead of with member stockholders, as formerly, it lost its exempt status.

We think that that case is clearly applicable here. There is nothing in that opinion to sustain petitioner's argument that the principles therein set down apply only to insurance companies. In the instant case petitioner became taxable on February 1, 1940. Its net income after that date was subject to tax. Under our decision in *Royal Highlanders, supra*, the succeeding eight months constituted a taxable year beginning after December 31, 1939. It follows that petitioner is subject to the income tax rates imposed by the Second Revenue Act of 1940 and the excess profits tax.

In view of our holding that petitioner is taxable under the Second Revenue Act of 1940 it becomes necessary to decide several alternative issues. Petitioner urges that respondent's action in annualizing its excess profits tax net income for the period from February 1 to September 30, 1940, results in a distortion of income, a fictitious net income which is greater than the actual income, and that the tax thereon is unconstitutional. Respondent relies on *General Aniline & Film Corporation*, 3 T. C. 1070, and *Kamin Chevrolet Co.*, 3 T. C. 1076, wherein we sustained the right of the respondent to annualize income for excess profits tax purposes pursuant to section 711 (a) (3) (A), Internal Revenue Code. The same argument as to unconstitutionality was made in *General Aniline & Film Corporation, supra*, and was rejected. It does not appear that petitioner comes within the exception (sec. 711 (a) (3) (B)) and, in any event, no effort has been made to secure the benefits of that section. Cf. *Your Health Club, Inc.*, 4 T. C. 385. On the authority of *General Aniline & Film Corporation, supra*, respondent's action in computing petitioner's excess profits tax net income for the eight-month period ended September 30, 1940, on an annual basis is approved.

In computing petitioner's excess profits credit respondent ruled that petitioner was not in existence on January 1, 1940, and therefore its credit must be computed on an invested capital method pursuant to section 712 (a). The parties have stipulated that, if petitioner is subject to the excess profits tax, the credit computed under section 714 (the invested capital method) results in a lesser tax. It appears that

petitioner is not contesting the correctness of respondent's determination on this point. It is, therefore, unnecessary to decide whether or not petitioner was in existence prior to January 1, 1940, for the purpose of computing its excess profits credit in this proceeding.

In his amended answer respondent asked for an increased deficiency in excess profits taxes and resulting increased penalty, claiming that he erred in computing petitioner's excess profits credit. He contends that in computing petitioner's borrowed capital he erroneously included as a part thereof 50 percent of moneys deposited with petitioner for which petitioner had issued certificates of deposit. The Internal Revenue Code defines borrowed invested capital as follows:

SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year * * * shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust, plus,

* * * * * * *

Regulations 112, section 35.719–1 (d), in describing the term "certificate of indebtedness," reads in part as follows:

The term "certificate of indebtedness" includes only instruments having the general character of investment securities issued by a corporation as distinguishable from instruments evidencing debts arising in ordinary transactions between individuals. Borrowed capital does not include indebtedness incurred by a bank arising out of the receipt of a deposit and evidenced, for example, by a certificate of deposit, a passbook, a cashier's check, or a certified check.

Respondent argues that petitioner was really in the banking business and therefore the money deposited with it as evidenced by the certificates, hereinabove referred to, must be excluded in computing petitioner's borrowed capital. Respondent claims that these certificates fall squarely within the definition set forth in the regulations excluding indebtedness incurred by a bank and that, in any event, they are not instruments having the general character of investment securities. Petitioner denies that it is in the banking business and says that the burden is on respondent to show that he erred in his original notice of deficiency. The term "certificate of indebtedness" is not new. It appeared in earlier revenue acts, dealing, for example, with dividends paid credit and capital losses, and it appears in the present excess profits tax law creating a credit for debt retirement. The application of the term to any particular instrument has resulted in much litigation, none of which is helpful in determining whether or not the particular instrument here involved comes within section 719. We have heretofore held that sections 718 and 719, defining invested capital, must be given a strict construction. See *Journal Publishing Co.*, 3 T. C. 518, and *Flint Nortown Theatre Co.*, 4 T. C. 536. Are the funds

deposited with petitioner under the circumstances hereinabove set forth invested in petitioner's business? Does this certificate have the general character of investment securities? We think these questions must be answered in the affirmative. The money so advanced to petitioner was used in its business for the making of chattel loans. There is no question here, or at least it has not been argued, that the money so received had no business purpose or that the transactions were not bona fide in every respect. The certificate states upon its face that it is not subject to check. It is not negotiable. There are definite limitations on the right of a depositor to withdraw the funds deposited pursuant to its terms. Respondent's suggestion that petitioner was really in the banking business and that the funds evidenced by the certificates herein involved are analogous to the deposits of a bank is not borne out by the evidence. The distinction between ordinary bank deposits and the deposits such as these was recognized in *Stoddard* v. *Miami Savings & Loan Co.*, 63 Fed. (2d) 851. In that case the Miami Savings & Loan Co. issued certificates covering deposits received, which deposits were made subject to the bylaws of the association. The bylaws provided that applications for withdrawal of such deposits, should be filed in the order in which they were received and paid out of receipts. The association had organized a Christmas savings club, which provided for a return of a fixed amount at the close of the year if certain payments were made throughout the year. The plaintiff, a certificate holder, had served notice of withdrawal and then brought suit to enjoin the association from paying out funds to the Christmas club members before making payment to her. The Circuit Court of Appeals affirmed the District Court's action dismissing the complaint. The Circuit Court pointed out that, while both the members of the Christmas club and the certificate holders were creditors of the association, nevertheless the rights grew out of different contractual obligations and that the contractual limitation to pay certificate holders out of receipts was a different obligation than that created by the Christmas club memberships. The Circuit Court held that the right to demand payment from cash on hand and from receipts was a definite limitation on the certificate holder's rights and that there was no such limitation on the members of the Christmas club, and it pointed out that:

\* \* \* The distinction is that the demand of the appellant is not yet due, at least in the sense that an action might be maintained upon it. *Her money was in effect invested in the business of the association.* On the other hand, the demands of members of the Christmas Club are now past due, and the deposits of such members are much *more clearly analogous to loans to the association than are the deposits of appellant.* It may be conceded that both created a debtor and creditor relationship, but the right of the appellant to claim repayment is specifically conditioned upon the association having cash on hand to meet such

requirement, while the contracts of members of the Christmas Club, with equal precision, fixed a definite date of maturity. *These demands have thus become debts of the association in which the appellant has invested her money.* [Italics supplied.]

We do not pass on the question of whether or not petitioner is in the banking business. We think that is immaterial to the precise question presented. We merely hold that the certificate of deposit issued by petitioner is a certificate of indebtedness, an instrument having the general character of an investment security, and thus is within the meaning of section 719. It follows that the moneys secured by these certificates were properly includible in computing petitioner's capital for the purposes of excess profits tax credit.

The final issue is whether respondent properly imposed the 25 percent penalty for failure on the part of petitioner to file an excess profits tax return for the period under discussion. So far as the evidence before us reveals, petitioner still has not filed such return. The sole defense urged is that petitioner's officers believed that its tax year began in 1939 and, therefore, no return was required. There is no evidence on this important question. While the Second Revenue Act of 1940, requiring an excess profits tax return, became effective on October 8, 1940, the regulations extended the time for filing such return to March 15, 1941, regardless of when the taxable year ended. Thus, petitioner had over five months after the law became effective within which to take steps to protect itself from the imposition of this penalty. The Commissioner's assessment of the penalty for failure to file a return is not to be taken lightly. To escape the penalty petitioner must affirmatively show that its failure to file the required return was due to reasonable cause. In the case before us that has not been done. The mere belief that a return is unnecessary is not such reasonable cause. See *Burford Oil Co.*, 4 T. C. 614, and *O'Sullivan Rubber Co.* v. *Commissioner*, 120 Fed. (2d) 845.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

SMITH, *J.*, dissenting: I dissent from the conclusion of my brethren that the petitioner is liable to a 25 percent penalty for failure to file an excess profits tax return for its fiscal year ended September 30, 1940. Such penalty is imposed by section 291 of the Internal Revenue Code. It is imposed in case of a failure to make and file a return "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The petitioner did not file an excess profits tax return because it "believed that its tax year began in 1939 and therefore no return was required." The majority opinion states

that "There is no evidence on this important question," that is, as to the reason for not filing an excess profits tax return. It appears to me, however, that it is immaterial that the petitioner did not furnish evidence upon the question. Where the facts show that the petitioner had a reasonable cause for failure to file a return, no additional evidence is necessary.

It is also stated in the majority opinion: "The Commissioner's assessment of the penalty for failure to file a return is not to be taken lightly." I do not think that the respondent's imposition of the penalty should carry any weight with us. The Tax Court is not expected to rubber-stamp the Commissioner's determinations. We are to pass upon issues presented for our determination upon the evidence and in accordance with the law and justice.

The penalty for delinquency is in truth and fact purely a penalty. The fact that it is to be collected as a part of the tax is of no significance so far as the present issue is concerned. The imposition of the penalty is not a revenue measure. It is merely for the purpose of insuring collection of the tax imposed.

In *Spies* v. *United States*, 317 U. S. 492, the taxpayer had not filed a required tax return. He had been convicted of attempting to defeat and evade income tax in violation of section 145 (b) of the Revenue Act of 1936. Passing upon the question as to whether he was correctly convicted, the Supreme Court covered the whole field of penalties imposed by the revenue acts, including the delinquency penalty. The Court stated:

Sanctions to insure payment of the tax are even more varied to meet the variety of causes of default. It is the right as well as the interest of the taxpayer to limit his admission of liability to the amount he actually owes. But the law is complicated, accounting treatment of various items raises problems of great complexity, and innocent errors are numerous, as appear from the number who make overpayments. *It is not the purpose of the law to penalize frank difference of opinion or innocent errors made despite the exercise of reasonable care. Such errors are corrected by the assessment of the deficiency of tax and its collection with interest for the delay.* * * * [Emphasis supplied.]

Just what constitutes a reasonable cause for failure to file a return, in the absence of willful neglect (there is no suggestion made that the petitioner willfully neglected to file a return), is such a cause as appeals to a businessman, a man of the street, or a juror. It seems to me that the petitioner had a reasonable cause for failing to file an excess profits tax return for the taxable year. If the contention made by the petitioner in this case, which I believe was a reasonable contention, had been sustained, there would be no question of the 25 percent penalty in this case. It acted as a reasonable man would act. We, likewise, considering whether there was a reasonable cause for

failure to file a return, should act as a reasonable person would act and not mulct the petitioner to the extent of approximately $8,000 for making an innocent error.

ARUNDELL and MELLOTT, *JJ*., agree with this dissent.