PENDLETON & ARTO, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 9792. Promulgated June 27, 1947.

*Thomas A. Williams, Esq.*, for the petitioner.
*Allen T. Akin, Esq.*, for the respondent.

## OPINION.

Disney, *Judge*: We are here again to decide the question as to whether a financial arrangement constitutes borrowed capital, within the language of section 719 (a) (1), Internal Revenue Code,[1] defining it as outstanding indebtedness of the taxpayer (not including interest) evidenced by bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust. The petitioner, contending that the statute is satisfied by the situation presented, reviews many cases to demonstrate that there is indebtedness, arguing also that the money advanced to the petitioner had a business purpose, and that the transaction was bona fide. But these elements the respondent concedes to be present here, for on brief he says: "The Commissioner does not dispute that an indebtedness existed between petitioner and its parent corporation in 1942 and 1943"; and again, referring to contention of *bona fides* and business purpose: "No one disputes this fact." We may, therefore, pass directly to the further statutory requirement that indebtedness be evidenced by "note," etc. The respondent strongly denies that any such statutory requisite is shown.

The petitioner admits specifically that no note, in the usual form, was executed (until after deficiency notice issued—and does not rely on such belated compliance). It takes the view, in effect, that there was written contractual obligation entered into in 1936, wherein Davidson advanced money to pay notes payable to creditors in the sum of $75,817.25; that the petitioner was obligated to repay the advance "or loan"; that the indebtedness was secured by petitioner being required to deposit its collections in a bank account subject only to withdrawal by Davidson; that the petitioner needed capital and could not continue to operate without it; that the intent of the arrangement in 1936 was to extend credit to the petitioner over a period of years in order to furnish working capital; that petitioner had been unable, by the end of 1943, to repay the original indebtedness of $75,817.25,

---

[1] SEC. 719. BORROWED INVESTED CAPITAL.

(a) BORROWED CAPITAL.—The borrowed capital for any day of any taxable year shall be determined as of the beginning of such day and shall be the sum of the following:

(1) The amount of the outstanding indebtedness (not including interest) of the taxpayer which is evidenced by a bond, note, bill of exchange, debenture, certificate of indebtedness, mortgage, or deed of trust * * *.

it having in fact increased; that the agreements in 1936 constituted a written promise to pay for any moneys advanced for capital; and that the statute is thus satisfied. Thus it appears that the petitioner does not contend that there was here any particular instrument described in section 719 (a) (1). It never contends that there was note in any usual form (though contending that the agreements in 1936 contain written promise to pay), and, in effect, does not rely on bond, bill of exchange, debenture, mortgage, or deed of trust (or even of "certificate of indebtedness," except that the agreements have "many of the characteristics of a certificate of indebtedness"). Its contention is general that "if the 1936 agreements are examined carefully, it will be found that they contain attributes which characterize them as the type of documents which evidence indebtedness as defined by section 719 (a) (1), and that, therefore such indebtedness represents borrowed capital."

We have made such careful examination of the agreements executed in 1936, both on September 17, by petitioner, Stowell, and Davidson, and on September 25, by the creditors' committee and Davidson, though we fail to find anything consummated under the first agreement, the only one in which the petitioner was a party. After such examination and study of the numerous cases cited by both parties, which it is not necessary to discuss in detail, it is our view that the petitioner has failed to demonstrate an arrangement, contract, or instrument coming within the purview of section 719 (a) (1). The instrument of September 17 contains an agreement by Davidson to advance "funds to pay outstanding obligations * * * due the Creditors' Committee * * * not to exceed Eighty-five Thousand Dollars"; also, Davidson agreed to purchase the petitioner's assets. Obviously, such an agreement, if it implied any agreement by petitioner to repay Davidson, constitutes none by petitioner to pay more than "outstanding" obligations, or to pay above $85,000, or to pay any future debts. We consider it altogether insufficient to constitute a promise or note in any form to pay debts in 1942 and 1943, here involved, even if the September 17 agreement had been consummated in the later agreement of September 25, which to us it was not. We should here keep in mind that the affairs of petitioner were on September 17 in the hands of a creditors' committee, and that in the agreement of that date Stowell was "to immediately contact the Creditors' Committee and settle the obligations due said Creditors' Committee"; whereas on September 25, 1936, Davidson purchased from the committee itself the assets and capital stock of the petitioner for its net worth as shown by audit and did on October 22, 1936, issue its check to the committee, out of which there was paid $75,817.25 to note-holding creditors and $12,028.58 to petitioner's stockholders (repre-

senting value of their stock), as well as other minor items not significant here. The agreement of September 25 does contain the provision that, "Upon payment of the purchase price and upon transfer of title * * *, the Purchaser [Davidson] agrees to accept liability for all outstanding indebtedness of Pendleton & Arto, except interest charges waived in accordance with Clause 5 and except liability to stockholders of Pendleton & Arto," but the liability is clearly only for *outstanding* indebtedness, which was discharged by the proceeds of the check of October 22, 1936, and any possible inferential agreement by petitioner to repay must be considered equally limited. We are unable to find any promise by petitioner to pay anything thereafter, to anyone; yet, petitioner's position is that there was outstanding in 1942 and 1943 an agreement of the form and nature described in section 719 (a) (1) to discharge indebtedness then existing to Davidson. We find in the written agreements in 1936 no agreement by petitioner to repay Davidson, but only an agreement by Davidson to buy and pay the price set, which it did by paying the "outstanding indebtedness." It would, indeed, be a stretch of the imagination to think that such language obligated Davidson to continue to advance, and petitioner to repay, moneys throughout a period of several years—more than seven years to the end of 1943. So far as repayment of the $75,817.25 "outstanding" in September 1936 is concerned, the record shows repayment of $22,719.84 before the end of 1936, and repayment of $215,000 cash, as well as $5,156.62 by discounts, in 1937; so that it is apparent that by the end of 1937 the petitioner had in fact repaid the advances to pay "outstanding" debts mentioned in the agreements made in September 1936.

To us it is clear that the petitioner was in 1942 and 1943 indebted to Davidson—as the respondent admits; and, further, it is clear that the indebtedness was for money for operating capital. But it is equally clear, we consider, that the indebtedness in those years was not evidenced by anything in the written agreements in September 1936, or by anything else, so far as this record shows, except a mere open account between the parties, by which the parent furnished capital from time to time and the subsidiary, in effect, repaid it, when its finances permitted, through withdrawals by Davidson. That the principal bank account of the petitioner was subject to check only by its parent fails completely to demonstrate the requisites of section 719 (a) (1). Nothing in writing, of which the record apprises us, required such maintenance of bank account. We know only that it was so maintained.

Such an arrangement, or customary procedure, between parent and subsidiary can not stand the test of section 719 (a) (1). It fails altogether, we think, to comprise the mortgage, within the statute,

which the Circuit Court found in *Brewster Shirt Corporation* v. *Commissioner*, 159 Fed. (2d) 227, because of assignment of accounts receivable "as collateral security for all sums which may now or hereafter be due." Had Davidson wished at any time to cease advancing money, it was free to do so, so far as the record indicates; and obviously its interest in its subsidiary caused continuation of the arrangement. The status in 1942–1943 can not rest on the agreements in 1936. True, there was the agreement, on December 7, 1936, "setting a fixed interest charge of 6% per annum on the monies advanced by either party to the other which is used as operating capital," which rate was reduced in July 1941 to 3 per cent, but such agreement alone plainly can not be regarded as compliance with section 719 (a) (1). It could only approach one of the requisite forms of debt there mentioned, i. e., note, and could not possibly pertain to any other. But a mere promise to pay interest on any moneys which might be advanced does not constitute a note. Even after the deficiency notice and the issuance of a note, it did not represent any definite amount of debt; and a reason given for not executing a note was the fluctuating character of indebtedness. But this fact contravenes the essential element of a note—absolute promise to pay a sum certain, at a fixed or determinable future time—Black's Law Dictionary. There is found here no absolute promise to pay, no sum certain, no fixed or determinable future time. The arrangement for withdrawals by Davidson at any time desired from a bank account, the application of other items against the indebtedness, the fluctuation in the amounts, all negative the essential attributes of a note as above defined. This is not the narrow construction argued against by the petitioner, and though the *Brewster* case, *supra*, relied on with other cases by the petitioner for broad construction, says the construction there was narrow (in the face of an assignment by way of collateral security, or mortgage), it nowhere says that our construction in other cases has been too narrow. The statute enumerates certain forms of indebtedness as coming within its bounds. *Inclusio unius est exclusio alterius.* Other forms were, we think, clearly intended to be excluded. This can only fairly mean that the mere presence of operating capital obtained can not, alone, satisfy the statute, but it must be represented by established forms of debt. Mere open account was not included, and we have heretofore considered it was not intended. *Flint Nortown Theatre Co.*, 4 T. C. 536. *Economy Savings & Loan Co.*, 5 T. C. 543, involving certificates of deposit, does not demonstrate the arrangement here to be a certificate of indebtedness. It has no attribute of an investment security, such as issued by corporations. Regulations 112, sec. 35.719–1 (d), covering the section here involved. Other cases cited are found to be distinguishable.

That the petitioner needed capital and obtained it from its parent, by the procedure set up on the books of the two corporations, does not of itself permit application of section 719 (a) (1). We must take Congress' words as expressed. If the statute should be broadened to include other forms of debt, it is not our burden or proper power so to do. We should apply the language in its usual sense, *Deputy* v. *DuPont*, 308 U. S. 488; *United States* v. *Kirby Lumber Co.*, 284 U. S. 1; *Journal Publishing Co.*, 3 T. C. 518, and include nothing not included, therefore under ordinary interpretation excluded, by Congress. The gist and effect of petitioner's argument is that other similar evidences of debt should, because of the general intent of the law, be added to those enumerated in section 719 (a) (1). But we may not logically or reasonably disregard the fact that Congress specifically listed several forms of indebtedness, and did not, as it did in defining indebtedness in section 783 (d) of the Internal Revenue Code, include "or other evidence of indebtedness." See *Journal Publishing Co., supra.* In such a situation we regard as not controlling here the thought as to ascertaining general purpose of statutes even despite literal meaning, suggested by the petitioner from such cases as *United States* v. *American Trucking Association, Inc.*, 310 U. S. 534; *Helvering* v. *New York Trust Co.*, 292 U. S. 455. Congress indicated to us, by the specific listing of the several indicia of debt and omission of the catch-all phrase elsewhere used, that such, and only such, evidences of debt were within the general purpose of the law. We find no error in the determination by the Commissioner that section 719 (a) (1) was not complied with. This renders it unnecessary to discuss the fact that the amounts of indebtedness in 1942–1943 include interest, excluded by the statute from borrowed capital.

*Decision will be entered for the respondent.*